## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 29 2019, 7:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeremy L. Seal
Seymour, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.R., Mother, R.R., Father,[1] and N.R., Child,

J.R.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

March 29, 2019

Court of Appeals Case No. 18A-JT-2119

Appeal from the Jackson Superior Court

The Honorable Bruce A. MacTavish, Judge

Trial Court Cause No. 36D02-1801-JT-3

---

[1] We note that, although Father's parental rights were also terminated, he does not join in this appeal. However, under Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.



*Appellee-Petitioner.*

**Kirsch, Judge.**

J.R. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor child, N.R. ("Child"). Mother raises the following restated issue on appeal: whether the juvenile court's judgment terminating her parental rights was supported by clear and convincing evidence.

We affirm.

## Facts and Procedural History

In November 2016, the Indiana Department of Child Services ("DCS") received a report alleging (1) Child, born March 1, 2015, was the victim of neglect, (2) Mother and R.R. ("Father")[2] were living together despite there being a no contact order between them, and (3) methamphetamine use and domestic violence occurring in the home. *Pet'r's Ex.* 2 at 20-21. In response to

---

[2] Father consented to the termination of his parental rights and does not join in this appeal. We, therefore, only set forth those facts necessary to Mother's appeal.

this report, family case manager Lesley Hewitt-Rooks ("FCM Hewitt-Rooks") investigated the report and conducted an assessment. *Id*. at 21. After several attempts, FCM Hewitt-Rooks was able to make contact with Father, who tested positive for morphine and methamphetamine. FCM Hewitt-Rooks was not able to make contact with Mother, even though she observed Mother inside the home on one occasion. *Id*. at 22; *Pet'r's Ex*. 3 at 29. On December 2, 2016, FCM Hewitt-Rooks went to the home and observed several individuals sitting on the sofa smoking something out of foil and that Father seemed to be under the influence of drugs or alcohol when he answered the door. *Pet'r's Ex*. 3 at 29. Although Father denied using methamphetamine that day, he stated he had used methamphetamine the day before and that Child was in his care when he did so. *Id*. At that time, Mother's whereabouts were unknown, and FCM Hewitt-Rooks was not able to make contact with her. *Id*.; *Pet'r's Ex*. 2 at 22. DCS removed Child from the care of Mother and Father on that date due to the young age of Child, Father's admitted drug use, the parents' domestic violence, and Mother's absence. *Pet'r's Ex*. 2 at 22.

[4] On December 6, 2016, DCS filed a child in need of services ("CHINS") petition, due to, among other things, Mother's: (1) drug use; (2) domestic violence involvement; and (3) absence from the Child's life. *Appellant's App. Vol. 2* at 23-27. At the detention hearing held on December 6, 2016, Mother failed to appear, and the juvenile court ordered continued removal of Child from Mother's care and authorized Child's placement in relative care. *Id*. at 31-32. Mother did not appear for the initial hearing on December 12, 2016. *Id*. at

34. Mother also did not appear for informal mediation on January 4, 2017. *Pet'r's Ex.* 7 at 46.

[5] On January 25, 2017, Mother again failed to appear for the CHINS hearing. *Appellant's App. Vol. 2* at 37. At the hearing, Father admitted to the allegations in the CHINS petition, and the juvenile court found Child to be a CHINS and entered a dispositional decree. *Id*. at 37-40. Under the dispositional decree, the juvenile court ordered Child's continued removal from both Mother and Father's care, and Father was directed to participate in a variety of services. *Id*.

[6] Mother appeared in court for the first time on February 8, 2017 for a change of placement hearing, but she failed to appear at the review hearings held on April 26, 2017 and July 26, 2017. *Pet'r's Ex*. 11 at 58; *Pet'r's Ex*. 12 at 62; *Pet'r's Ex*. 14 at 68. Mother did appear in court on October 4, 2017 for a permanency hearing. The juvenile court found that Mother had not complied with the reunification case plan because she had: (1) tested positive for illegal substances during the reporting period; (2) missed scheduled visitation with Child; (3) failed to participate in services; (4) remained homeless during the majority of the reporting period; and (5) failed to maintain communication with DCS. *Pet'r's Ex*. 15 at 70-71. The juvenile court ordered concurrent permanency plans of reunification and adoption. *Id*. Mother failed to appear for hearings on October 25, 2017 and November 29, 2017. *Pet'r's Ex*. 16 at 74; *Pet'r's Ex*. 17 at 78.

[7] On November 29, 2017, a dispositional hearing was held, and the juvenile court issued a dispositional decree that ordered Mother to, among other things: (1) contact FCM every week; (2) notify FCM of any changes in address, household composition, employment, or telephone number; (3) notify FCM of any arrest or criminal charges; (4) allow FCM and other service providers to make announced and unannounced visits to Mother's home; (5) enroll in any recommended programs or assessments; (6) keep all appointments with service providers, DCS, and court appointed special advocate ("CASA"); (7) maintain suitable, safe, and stable housing; (8) secure and maintain a legal and stable source of income; (9) do not use illegal controlled substances; (10) complete a substance abuse assessment and follow all recommendations; (11) submit to random drug screens; (12) attend all scheduled visitations with Child; and (13) participate in home-based case management. *Pet'r's Ex*. 17 at 79-80. The juvenile court also changed the permanency plan for Child to termination of parental rights and adoption. *Id*. at 81.

[8] Mother failed to appear at the periodic review hearings held on January 3, 2018 and April 18, 2018. *Pet'r's Ex*. 18 at 83; *Pet'r's Ex*. 19 at 87. At both hearings, the juvenile court found that the reasons for Child's removal had not been alleviated and that Mother had not complied with the dispositional order. *Pet'r's Ex*. 18 at 83-84; *Pet'r's Ex*. 19 at 87-88.

[9] On January 2, 2018, DCS filed its petition to terminate Mother's parental rights to Child. An evidentiary hearing on the petition was held on May 9, 2018. At the hearing, evidence was presented that Mother struggled with substance abuse

and continued to use drugs throughout the proceedings. *Tr. Vol. I* at 18-19, 60-61. Mother admitted to using illegal substances and, over the course of the proceedings, refused to cooperate with DCS and to participate in substance abuse treatment and in all drug screens. *Id*. at 59-60. When Mother did complete drug screens, she tested positive for methamphetamine, buprenorphine, and amphetamine. *Id*. at 18-19, 59; *Pet'r's Ex*. 42 at 188-202. Her positive drug tests spanned the length of the proceedings, starting in December 2016 and continuing to November 2017. *Tr. Vol. I* at 51, 59.

[10] Mother was arrested on April 25, 2018 and charged with visiting a common nuisance that is maintained for the unlawful use of controlled substances or items of drug paraphernalia. *Id*. at 21. Mother failed to complete follow up treatments and recommendations. *Id*. at 57, 60-61. FCM Rebecca Claycamp ("FCM Claycamp") made a referral for Mother to attend Centerstone, an inpatient treatment facility, on December 18, 2017, but Mother failed to participate. *Id*. at 57. A follow-up referral was made on January 10, 2018, and Mother again failed to appear. *Id*. Mother also failed to complete a recommended home-based case management program and recommended services for domestic violence. *Id*. at 60-61. FCM Claycamp testified that Mother admitted to her that she had a problem with drugs and needed help, and FCM Claycamp believed that Mother's substance abuse impaired her ability to care for Child. *Id*. at 60-61, 66.

[11] Lauren Perryman, clinical manager for Life Spring, completed an assessment of Mother in November 2017 and recommended that Mother attend individual

therapy and participate in medication management. *Id.* at 25-26. Mother only attended one individual therapy session on December 29, 2017. *Id.* at 26. Mother did participate in medication management but was discharged March 30, 2018 for missing four appointments. *Id.* at 27, 30. Life Spring referred Mother to a detox program, which she completed in December 2017, but when Life Spring referred her to a thirty-day inpatient treatment facility in January or February of 2018, Mother again failed to attend. *Id.* at 27-29.

[12] Mother also failed to consistently visit Child. *Id*. at 33-37, 64. In September 2017, Mother attended four out of six visitations; in October 2017, three out of eight; in November 2017, one out of seven scheduled visitations; and in December 2017, she failed to attend any visitations. *Id.* at 36. In January 2018, Mother attended one visitation, and in February 2018, Mother did not visit Child despite three opportunities. *Id.* at 36, 38. Mother's referral for schedule visitations was closed in February 2018 due to non-compliance. *Pet'r's Ex*. 40. Over the course of the proceedings, Mother visited Child seven out of fifty-five scheduled visitations. *Id.*

[13] Mother also did not maintain consistent contact with DCS throughout the proceedings, and FCM Claycamp described communication with Mother as "sporadic." *Pet'r's Ex*. 18 at 83; *Tr. Vol. I* at 54. DCS made efforts to maintain contact, but Mother failed to provide the necessary contact information. *Tr. Vol. I* at 65. Mother failed to maintain stable housing during the proceedings and stayed at "three or four different places" and frequently ended up on "the streets." *Id.* at 13, 17, 76-77. At the time of the termination hearing, Mother

was living with a friend, but her name was not on the lease, and she did not know that address. *Id.* at 22-23. Additionally, Mother also failed to maintain stable employment. *Id.* Although she stated that she is searching for a job, FCM Claycamp testified that Mother has not worked during the life of the case. *Id.* at 23, 65.

[14] Throughout the proceedings, the juvenile court repeatedly found in its periodic case review orders that the cause of Child's removal and placement outside the home had not been alleviated. *Pet'r's Ex.* 12 at 63, *Pet'r's Ex.* at 84, *Pet'r's Ex.* at 88. FCM Claycamp testified that termination was in Child's best interest and that the conditions that caused Child's removal would likely not be remedied due to Mother's failure to participate in services, her substance abuse, and the lack of a stable job and housing. *Tr. Vol. I* at 65-67. The CASA also testified that termination of the parent-child relationship was in Child's best interest. *Id.* at 82-83. Child's therapist, Kathy O'Donnell ("O'Donnell") testified that Child should not be returned to Mother's care. *Id.* at 47. FCM Claycamp, CASA, and O'Donnell all agreed that it was in the Child's best interest to stay in the care of the foster family. *Id.* at 47, 70-71, 83. FCM Claycamp testified that Child was "very well loved" by her foster family. *Id.* at 67. The CASA testified that Child was "doing quite well" in the foster home. *Id.* at 82. O'Donnell testified that Child was "very happy" in the foster home and that Child suffers from post-traumatic stress disorder but had progressed "wonderfully" in her placement. *Id.* at 46-47. DCS's plan for Child was adoption by her foster family. *Id.* at 71.

At the conclusion of the hearing, the juvenile court took the matter under advisement. On August 30, 2018, the juvenile court issued its order terminating Mother's parental rights to Child. Mother now appeals.

# Discussion and Decision

Mother argues that the juvenile court erred in terminating her parental rights because DCS did not prove several of the requirements by clear and convincing evidence. As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her child, and parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need

not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[17] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[18] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (A) that one (1) of the following is true:

>> (i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

>> (ii)    A court has entered a finding under I.C. 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

>> (iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the house as a result of the child being alleged to be a child in need of services or a delinquent child.

> (B)  that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

### *Removal under a Dispositional Decree*

[20] Mother first argues that there was not sufficient evidence presented to prove that Child had been removed from Mother's care for at least six months under a dispositional decree. Mother seems to argue that Indiana Code section 31-35-2-4(b)(2)(A) requires DCS to wait six months from when the juvenile court orders the parent to participate in services before filing its termination petition. Mother asserts that because the juvenile court ordered only Father to participate in services on January 25, 2017, as he was the only parent to appear for the hearing, the six-month time frame for her did not start until December 20, 2017, when the juvenile court finally directed Mother to participate in services.

[21] Initially, we note that Mother raises this argument with no citation to any legal authority and has, therefore waived this issue. *See* Ind. Appellate Rule

46(A)(8)(a) ("The argument must contain the contentions of the appellant on the issues presented supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on."). A party waives an issue where the party does not develop a cogent argument or provide adequate citation to authority and portions of the record. *Smith v. State,* 822 N.E.2d 193, 202-03 (Ind. Ct. App. 2005), *trans. denied*.

[22] Waiver notwithstanding, we conclude that the evidence showed that Child had been removed from Mother for at least six months under a dispositional decree. "This [c]ourt has previously explained that '[f]or purposes of the element of the involuntary termination statute requiring a child to have been removed from the parent for at least six months under a dispositional decree before termination may occur, . . . such a dispositional decree is one that authorizes an out-of-home placement.'" *In re D.D.*, 962 N.E.2d 70, 75 (Ind. Ct. App. 2011) (quoting *A.P. v. Porter Cty. Office of Family & Children*, 734 N.E.2d 1107, 1116 (Ind. Ct. App. 2000), *trans. denied*) (internal quotations omitted). Here, under the dispositional decree ordered on January 25, 2017, the juvenile court ordered Child's continued removal from both Mother and Father's care. *Appellant's App. Vol. 2* at 37-40. Therefore, at the time the termination petition was filed on January 3, 2018, Child had been removed from Mother's care for at least six months under a dispositional decree. Based upon this, we conclude that the

evidence supported the juvenile court's determination that Child had been removed from Mother for at least six months under a dispositional decree.[3]

### *Conditions Remedied*

[23]     Mother contends that the juvenile court erred in concluding that DCS presented sufficient evidence that there was a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home would not be remedied. Specifically, she asserts that she was not able to make progress in completing services because of a lack of communication between her and DCS. Mother claims that, because she was unable to improve her situation, she was not able to continually engage in services. She maintains that the juvenile court's judgment should be reversed to offer a chance to improve.

[24]     In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we

---

[3] Further, we note that section 31-35-2-4(b)(2)(A) is written in the disjunctive, and to properly effectuate the termination of parental rights, the juvenile court only needed to find that one of the three requirements of subsection (b)(2)(A) had been established by clear and convincing evidence. *See* Ind. Code § 31-35-2-4(b)(2)(A); *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1157 n.6 (Ind. Ct. App. 2013), *trans. denied*. Here, the juvenile court found both that Child had been removed from her parents for at least six months under a dispositional decree under (b)(2)(A)(i) and that Child had been removed from her parents and had been under the supervision of DCS for at least fifteen of the last twenty-two months under (b)(2)(A)(ii). Mother does not argue that the juvenile court erred in finding (b)(2)(A)(ii) was proven, and we, therefore, conclude that, even if there was not sufficient evidence to support that Child had been removed from Mother for at least six months under a dispositional decree, section (b)(2)(A) was sufficiently proven.

determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *D.B.,* 942 N.E.2d at 873.

[25] Here, the conditions that led to Child's removal were Mother's drug use, domestic violence involvement, neglect, and absence from Child's life. *Appellant's App. Vol. 2* at 23-27. Prior to removal, DCS had received reports of domestic violence between Mother and Father in the presence of Child, and

when DCS attempted to contact Mother for an informal adjustment, it was not able to locate her. *Id*. 23-24. When FCM Hewitt-Rooks went to the home to speak to Father, she discovered he had been using methamphetamine, and Mother's whereabouts were not known. *Id*. at 25.

[26] As the CHINS proceedings were pending, Mother continued to fail to appear for hearings and was absent from a detention hearing on December 6, 2016, an initial hearing on December 12, 2016, and an informal hearing on January 4, 2017. Mother again failed to appear for the CHINS hearing on January 25, 2017, at which Father admitted to the allegations in the CHINS petition, and the juvenile court entered a dispositional decree that ordered Child's continued removal from both Mother and Father's care. *Id.* at 37-40.

[27] Mother appeared in court for the first time on February 8, 2017, but she then failed to appear at review hearings held on April 26, 2017 and July 26, 2017. Mother again appeared in court on October 4, 2017 for a permanency hearing but failed to appear for hearings on October 25, 2017 and November 29, 2017. Although Mother failed to appear at the dispositional hearing on November 29, the juvenile court issued a dispositional decree that ordered Mother to participate in various services, to maintain contact with DCS, to not use drugs, and to maintain stable housing and employment. Mother then failed to appear for periodic review hearings on January 3, 2018 and April 18, 2018.

[28] Evidence was presented that Mother struggled with substance abuse and that she continued to use drugs and refused to cooperate with DCS and to

participate in substance abuse treatment and drug screens throughout the proceedings. *Tr. Vol. I* at 18-19, 59-61. When Mother did complete drug screens, she tested positive for methamphetamine, buprenorphine and amphetamine. Her positive drug tests spanned the length of the proceedings, starting in December 2016 and continuing to November 2017. *Id.* at 18-19, 51, 59; *Pet'r's Ex.* 42 at 188-202. Mother was arrested a few weeks before the termination hearing and charged with visiting a common nuisance that is maintained for the unlawful use of controlled substances or items of drug paraphernalia. *Tr. Vol. I* at 21. FCM Claycamp made a referral for Mother to attend an inpatient treatment facility, but Mother failed to participate and failed to appear for a follow-up referral. *Id.* at 57. Mother also failed to complete a recommended home-based case management program and the recommended services for domestic violence. *Id.* at 60-61.

[29] Mother failed to consistently visit Child. Over the course of the proceedings, she only visited Child seven times out of fifty-five scheduled visitations. *Id.* at 33-37, 64; *Pet'r's Ex.* 40. Additionally, Mother did not maintain consistent contact with DCS throughout the proceedings, and FCM Claycamp described communication with Mother as "sporadic." *Pet'r's Ex.* 18 at 83; *Tr. Vol. I* at 54. Mother also failed to maintain stable housing during the proceedings, staying at "three or four different places" and frequently ended up on "the streets." *Tr. Vol. I* at 13, 17, 76-77. At the time of the termination hearing, Mother was living with a friend but was not on the lease and did not know that address. *Id.* at 22-23. Additionally, Mother also failed to maintain stable employment, and

FCM Claycamp testified that Mother has not worked during the life of the case. *Id.* at 23, 65.

[30]   DCS is not required to rule out all possibilities of change; it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied.* Also, as we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Although Mother requests that the juvenile court's judgment be reversed to provide her the chance to improve herself, she was given ample opportunity and time to complete services and better herself during the proceeding, and she failed to maintain contact with DCS or show any progress in remedying the conditions that resulted in Child's removal from her care and continued placement out of her care. Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that

there is a reasonable probability that the conditions that resulted in Child's placement outside the home would not be remedied.[4]

### Best Interests of Child

[31] Mother argues that DCS failed to prove that termination was in the best interests of Child because she was not given sufficient opportunity to engage with the services offered by DCS and with Child. She contends that, because of this lack of opportunity, is was not possible to determine if future harm to Child was inevitable and making a determination that termination is in Child's best interests was premature.

[32] In determining what is in the best interests of the child, a trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id*. (citing *In re R.S., 774* N.E.2d 927, 930 (Ind. Ct.

---

[4] We need not address whether the juvenile court properly concluded that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being because Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1157 n.6. Mother does not raise an argument that the juvenile court erred in concluding that the continuation of the parent-child relationship poses a threat to Child's well-being and has, therefore, waived the issue for appeal. *Smith v. State,* 822 N.E.2d 193, 202-03 (Ind. Ct. App. 2005) (stating that a party waives an issue where the party does not develop a cogent argument or provide adequate citation to authority and portions of the record), *trans. denied*.

App. 2002), *trans. denied*).  A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interests of the child.  *In re A.P.* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012).  Testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests.  *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[33]  A juvenile court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship.  *In re A.K.*, 924 N.E.2d at 224.  Additionally, a child's need for permanency is an important consideration in determining the best interests of a child.  *Id*. (citing *McBride v. Monroe Cty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).  At the time of the termination hearing, Child had been removed from Mother's care for almost one and a half years, and Mother had failed to make the changes in her life necessary to provide Child with a safe and healthy environment.  As discussed above, DCS presented sufficient evidence that there was a reasonable probability that Mother would not remedy the reasons for Child's removal from her care.  Additionally, FCM Claycamp and the CASA both testified that they believed termination of Mother's parental rights would be in Child's best interests.  *Tr. Vol. I* at 66-67, 82-83.  FCM Claycamp testified that the conditions that caused Child's removal would likely not be remedied due to

Mother's failure to participate in services, her substance abuse, and the lack of a stable job and housing. *Id.* at 65-67. Child's therapist, O'Donnell, testified that Child should not be returned to Mother's care and that Child suffers from post-traumatic stress disorder but had progressed "wonderfully" in her placement outside of Mother's care. *Id.* at 46-47. Based upon the totality of the evidence, we conclude that the evidence supported the juvenile court's determination that termination of Mother's parental rights was in Child's best interests.

[34] Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[35] Affirmed.

Riley, J., and Robb, J., concur.